## Exhibit A

## AFFIDAVIT OF SPECIAL AGENT ANTHONY FONTANELLA

I, Anthony Fontanella, Special Agent of the United States Drug Enforcement Administration (hereinafter "DEA") do hereby depose and state:

## I.    INTRODUCTION

1.     I have been a Special Agent with the Drug Enforcement Administration since April 2018.   I have been assigned to the Springfield Resident Office of the DEA's New England Division since September 17, 2018.   As such, I am a law enforcement officer of the United States within the meaning of 21 U.S.C. § 878, as well as 18 U.S.C. § 2510(7), in that I am empowered by law to conduct investigations of offenses enumerated in Title 21 of the United States Code and 18 U.S.C. § 2516(1)(e).

2.     In connection with my official duties as a DEA Special Agent, I am responsible for conducting investigations into violations of Titles 18, 21, and 31 of the United States Code and other federal criminal statutes.   As a Special Agent of the DEA, I am responsible for investigations focusing on the importation and distribution of illegal narcotics.   I have received basic training in narcotics investigations at the DEA Academy located in Quantico, Virginia.

3.     In addition to my training, I have had experience in the investigation of the activities of narcotics traffickers.   Since joining the DEA, I have participated in narcotics investigations, both as a case agent and in subsidiary roles, relating to the distribution of controlled substances, including marijuana, cocaine, heroin, and other illegal substances.   I have participated in almost all aspects of narcotics trafficking investigations including, but not limited to, conducting surveillance, using confidential informants, executing arrest and search and seizure warrants, and conducting court-authorized electronic surveillance.

## II.   PURPOSE OF AFFIDAVIT

4.     I submit this affidavit in support of a Verified Complaint for Forfeiture *in Rem*

against the following properties:

a.   The real property located at 32 Main Street, Monson, MA 01057, including all buildings, appurtenances, and improvements thereon, more fully described in a deed recorded with the Hampden County Registry of Deeds on December 29, 2017, in Book 22010, page 569 ("DEFENDANT PROPERTY 1");

b.   The real property located at 36 Main Street, Monson, MA 01057, including all buildings, appurtenances, and improvements thereon, more fully described in a deed recorded with the Hampden County Registry of Deeds on December 7, 2017, in Book 21978, Page 156 ("DEFENDANT PROPERTY 2");

c.   The real property located at 151 Palmer Road, Monson, MA 01057, including all buildings, appurtenances, and improvements thereon, more fully described in a deed recorded with the Hampden County Registry of Deeds on October 31, 2018, Book 22428, Page 467 ("DEFENDANT PROPERTY 3");

d.   The real property located at 4026 Pleasant Street, Thorndike, MA 01079, including all buildings, appurtenances, and improvements thereon, more fully described in a deed recorded with the Hampden County Registry of Deeds on October 23, 2018, Book 22413, Page 484 ("DEFENDANT PROPERTY 4"); and

e.   The real property located at 2041-2043 High Street, Three Rivers, MA 01080, including all buildings, appurtenances, and improvements thereon, more fully described in a deed recorded with the Hampden County Registry of Deeds on March 4, 2020, Book 23113, Page 498 ("DEFENDANT PROPERTY 5")

(collectively, the "DEFENDANT PROPERTIES").

5.     As set forth below, probable cause exists to believe that the DEFENDANT

PROPERTIES are subject to forfeiture to the United States, pursuant to 21 U.S.C. § 881(a)(7), as

"[a]ll real property, including any right, title, and interest (including any leasehold interest) in the

whole of any lot or tract of land and any appurtenances or improvements, which is used, or

intended to be used, in any manner or part, to commit, or to facilitate the commission of, a

violation of this subchapter punishable by more than one year's imprisonment."   Specifically,

2

there is probable cause to believe that the DEFENDANT PROPERTIES have been used, or

intended to be used, to commit, or to facilitate the commission of, the following offenses:

manufacturing, distribution and possession with the intent to distribute marijuana, in violation of

21 U.S.C. § 841; conspiracy to violate the Controlled Substances Act, in violation of 21 U.S.C.

§ 846; and/or use and maintenance of a drug-involved premises, in violation of 21 U.S.C. § 856,

because the DEFENDANT PROPERTIES are used for growing marijuana for illicit distribution.

6.      The information contained in this affidavit is based on witness interviews,

conversations with other federal, state, and local law enforcement officers, the review of records,

documents and other evidence obtained during this investigation, my personal knowledge and

observations, and my training and experience.

## III.    TRAINING AND EXPERIENCE

7.      With regard to illicit marijuana operations, specifically, I have knowledge

regarding the identification, location, and destruction of marijuana growing operations and can

recognize the common methods used to cultivate marijuana and the different types and

configurations of equipment used in marijuana growing operations.   I know that successful

cultivation of marijuana inside a structure requires the regulation of heat, moisture, humidity and

oxygen within the structure.   The indoor cultivation of marijuana requires the use of numerous

high-intensity metal halide, sodium or LED lights, often in the output range of 400 to 1000 watts.

The required electricity consumption is significant.   These types of lights often require a ballast

transformer to convert 110 voltage to 220 volts.   I know indoor grows often require a form of a

regulated ventilation system, to provide fresh air and to exhaust extra heat and humidity.   These

lights, transformers, and ventilation fans, etc. are generally connected to one or more timing

devices, or electronic sensors, so that they are turned on and off at regulated intervals in an effort

3

to simulate the environmental stimuli the plants would experience outdoors.   The constant use of this type of grow equipment results in a high consumption of electricity.   Structures will often be modified to accommodate the extra vents and electrical demands.   The electricity will sometimes be diverted from the source in order to circumvent the meter.   Thus, the electric could be stolen from the power supplier and not captured as being consumed.   Windows will often be covered from the inside to prevent detection from law enforcement, or as a result of the altering of the interior of the structure to accommodate the grow rooms.

8.       I also know, through training and experience, that indoor marijuana growing operations require a large amount of equipment and supplies.   The type of equipment required to grow marijuana (large lights, numerous electrical cords, water trays, PVC piping, water pumps, hoses, chemicals, fertilizers, sprayers, as well as light shields, ballast transformers, dehumidifiers, air filtration and conditioning units, potting soil or other grow medium, pots, etc.) is bulky and easily recognizable.   Persons involved in the indoor cultivation of marijuana often utilize outbuildings and/or other storage facilities (commercial for-rent storage units, for example) when they are unable or unwilling to store these items in their own residences.   I am further aware that an indoor cultivation operation requires routine maintenance and oversight which can be time consuming and labor intensive.

9.       I am also aware, through training and experience, that drug traffickers often place assets, such as real property, in the names of other persons or entities, including limited liability companies, to conceal their true ownership, the purpose for which they were acquired, and the manner by which they were acquired.

4

10.     This affidavit does not contain all the information known to me and other law enforcement officers regarding the investigation, but only those facts that sufficient to establish probable cause for the forfeiture of the DEFENDANT PROPERTIES.

## IV.     PROBABLE CAUSE

### A. The DEFENDANT PROPERTIES Are Not Licensed to Produce or Sell Marijuana.

11.     Growing and distributing marijuana remains illegal under Federal law.   However, under Massachusetts law, the possession and cultivation of small amounts of marijuana can be legal under state law in certain circumstances.   The cultivation of large quantities of marijuana and the cultivation of marijuana for sale by private individuals remains unlawful under both Massachusetts law, as well as under federal law.   Under Massachusetts law, a business entity can apply to the Massachusetts Cannabis Control Commission for a license to produce or sell marijuana within the state.   The Commission maintains an online database of licensees which can be indexed by business name, business address, and mailing address.   A review of that database, on June 11, 2020, showed no current or pending Massachusetts state licenses for marijuana production or sale associated with the DEFENDANT PROPERTIES or the persons or entities that own the DEFENDANT PROPERTIES.   Of course, even if such persons or entities were licensed by Massachusetts, use or intended use of the DEFENDANT PROPERTIES to grow, store, or cultivate marijuana would still violate federal law and subject the DEFENDANT PROPERTIES to forfeiture.

### B. Property Records for the DEFENDANT PROPERTIES

12.     The property records for the DEFENDANT PROPERTIES show that ownership of each property was transferred within the last three years and that an individual named Xing Gao Wang (*a.k.a.* Xing Guo Wang, Xing G. Wang) either owns or is associated with the

corporate entity that owns each of the DEFENDANT PROPERTIES, with the exception of

DEFENDANT PROPERTY 1.   For example:

a. DEFENDANT PROPERTY 1 is owned by BG Real Estate, Inc., a Massachusetts corporation, registered with the Secretary of State on December 27, 2017.   It was purchased on December 29, 2017 for $125,000.   The registered agent of the corporation is listed as Yu Xiang Liu, who is also listed as holding all of the company's officer and director positions.

b. DEFENDANT PROPERTY 2 is owned by 36 Main Street, LLC, a Massachusetts limited liability company, registered with the Secretary of State on November 20, 2017.   It was purchased on December 7, 2017 for $219,000.   Xing Guo Wang is listed as the resident agent of the LLC, and the LLC's manager, Secretary of the Commonwealth ("SOC") signatory, as well as the individual responsible for the real property.

c. DEFENDANT PROPERTY 3 is owned by Palmer Road, LLC, a Massachusetts limited liability company, registered with the Secretary of State on August 14, 2018. It was purchased for $475,000 on October 31, 2018.   Palmer Road, LLC lists Xing Gao Wang as its resident agent, the SOC signatory, as well as the individual responsible for the real property.

d. DEFENDANT PROPERTY 4 is owned by Pleasant 4026, LLC, a Massachusetts limited liability company, registered with the Secretary of State on July 19, 2018.   It was purchased on October 23, 2018 for $75,000. Pleasant 4026, LLC lists Xing Gao Wang as the SOC signatory, as well and the individual responsible for the real property.

e. DEFENDANT PROPERTY 5 is owned by Xing Gao Wang.   It was purchased on February 24, 2020 for $138,000.

13.   In addition to four of the DEFENDANT PROPERTIES, Xing Gao Wang acquired

another property, 1036 Central Street, Palmer MA 01069 ("1036 Central St.") for $54,000 on

February 20, 2019.   As discussed in more detail below, there is probable cause to believe that

the DEFENDANT PROPERTIES are being used to operate a large scale marijuana cultivation

operation, and evidence gathered during the course of this investigation indicates that individuals

who reside at 1036 Central St. work at or are connected to the DEFENDANT PROPERTIES.

Based on my training and experience, I am aware that other investigations have observed

workers at large scale marijuana cultivation operations residing together in one location and traveling back and forth to the various grow houses.

## C. Surveillance of the DEFENDANT PROPERTIES

14.     In July 2019, the Monson Police Department ("Monson PD") received a citizen complaint, from an individual known to the Monson PD, that DEFENDANT PROPERTY 1, DEFENDANT PROPERTY 2, and DEFENDANT PROPERTY 3 in Monson were being used as illegal marijuana grow-houses.   Since that time, the Monson PD and other federal and local law enforcement have been conducting surveillance on the DEFENDANT PROPERTIES.

15.     DEFENDANT PROPERTIES 1, 2, 4, and 5 are residential properties, but exhibit characteristics specific to large-scale self-contained indoor marijuana grows.   For example, it does not appear that any individuals reside at these residences, as no vehicles are consistently at the houses or stay overnight, although in recent weeks an individual was observed staying at DEFENDANT PROPERTY 1.   Aside from a few pieces of furniture, investigators have not observed any items outside, such as boots, children's toys, trash cans, garden tools, or gas grills. Investigators also noted that the yards of these properties were minimally landscaped and the lawns were not mowed on a regular basis.   From my training and experience, I know that residences being used for large-scale indoor marijuana grows usually are not also used for habitation, and as a result are often devoid of landscaping or items of recreation which would be present at a habitable residence.

16.     During surveillance, investigators never saw the windows open at these properties, and noted that the shades and curtains in the homes were drawn shut, despite hot temperatures and an absence of air conditioning units in the summer months.   Agents observed on several occasions that many of the windows at DEFENDANT PROPERTIES 4 and 5 were

covered from the inside with what appeared to be brown paper.   As noted above, in buildings housing indoor marijuana grows, windows will often be covered from the inside to prevent detection by law enforcement.

17.     Despite other homes placing trash cans at the curb, DEFENDANT PROPERTY 4 and DEFENDANT PROPERTY 5 have not had trash to pick up, nor until recently did DEFENDANT PROPERTY 1, when an individual began staying there.   DEFENDANT PROPERTY 2 has not had trash to pick up consistently, but agents have observed trash cans left out by the curb sporadically.   At night, it appeared that a few lights at DEFENDANT PROPERTY 2 and DEFENDANT PROPERTY 4 were set on a timer, as the same lights would be on despite there being no one at the home.   Other rooms were always noted to be pitch dark, suggesting that false walls could have been constructed in front of the windows.

18.     DEFENDANT PROPERTY 3 is not a residential property, but a brick warehouse with virtually no windows.   In November 2018, a Monson firefighter filed a complaint with the building department, reporting that on November 27, 2018, there was a dumpster outside the loading dock of DEFENDANT PROPERTY 3 with a large amount of building materials in it. That same individual reported that two days later, on November 29, 2018, the dumpster had been removed and there had been a delivery outside the loading dock of what appeared to be a sheetrock and 2x4s.   Thereafter, WYD Construction applied for a building permit for interior demolition, listing the owner of record as "Palmer Road, LLC / Xing Guo Wang".   The name of the business listed was "MA Equipment Supply, Inc." and phone number provided was a T-Mobile cellular telephone with no subscriber information.   That business has since dissolved.

19.     Surveillance has revealed that four vehicles regularly travel between the DEFENDANT PROPERTIES, where several individuals are believed to work, and 1036 Central

St., where several individuals connected to the DEFENDANT PROPERTIES are believed to reside.   Indeed, during the time frames of August 23, 2019 to September 7, 2019 and September 17, 2019 to November 1, 2019 officers tracked, using a GPS tracker, one vehicle consistently traveling between 1036 Central St. and at least one of the DEFENDANT PROPERTIES on an almost daily basis.   During over forty-five hours of dedicated surveillance by DEA during daylight hours, as well as random spot checks by Monson PD during day and night hours, investigators have not observed any other vehicles in the driveways of DEFENDANT PROPERTY 2, DEFENDANT PROPERTY 4 or DEFENDANT PROPERTY 5.   In addition, surveillance has consistently observed the same six individuals travelling between 1036 Central and the DEFENDANT PROPERTIES in the same vehicles and staying at those properties for multiple hours.   I believe these individuals are the laborers working to maintain the marijuana grows at these locations.

20.     For example, on November 16, 2019, one of these vehicles was observed at 1036 Central St.   The next day, November 17, 2019, the vehicle was seen backed up to the door of DEFENDANT PROPERTY 2, and later parked in the driveway of DEFENDANT PROPERTY 4.   From there, it traveled to Connecticut, where it was stopped for speeding.   The officer obtained consent to search the vehicle and located approximately 14.5 pounds of marijuana packaged in clear, vacuum-sealed bags.   The driver, Li Feng Li, was arrested for Possession of 1 kilogram or more of Cannabis Substance, Drug Possession near a Prohibited Place, Marijuana Drug Tax, and the speeding violation.   Li Feng LI used his cell phone to call Xing G. Wang, the owner or registered agent for the owners of several of the DEFENDANT PROPERTIES, who agreed to bond Li Feng LI out.   The vehicle has not been seen since the November 17, 2019 traffic stop.

9

21.     On August 29, 2019, a GPS tracking device, authorized by a warrant signed on August 23, 2019 by Palmer District Court Clerk Magistrate Angie Carter, indicated that another vehicle had stopped at 45 Bodwell Street, Avon, MA, the address of a grow supply store called "Hydro 4 Less".   A review of the "Facebook" page of "Hydro 4 Less" indicates that the store maintains a large warehouse of high-end specialty grow supplies and appears to cater to those growing marijuana.   Shortly thereafter, an officer observed the back of the vehicle sagging heavily as though it contained a large quantity of materials.   The vehicle returned to 1036 Central St. and, after approximately 20 minutes, was observed backed up to DEFENDANT PROPERTY 2.

**D. Monson Water Department Services Call to DEFENDANT PROPERTY 3**

22.     Law enforcement officers spoke with two Monson Water and Sewer employees who responded to a service call request at DEFENDANT PROPERTY 3, the warehouse, on January 31, 2020.   The employees described entering a room about eight feet long by eight feet wide that had access to the water lines.   One of the walls had a window and a door leading to the rest of the warehouse, but the window had been covered over so the employees could not see anything in the warehouse.   The employees noted a strong smell of air fresheners, with an underlying smell of marijuana.   The employees reported that they fixed a water valve in the warehouse.   In the following days, investigators noticed an increase in traffic to that property. In my training and experience, the reduced traffic during the water pressure issue at DEFENDANT PROPERTY 3 indicates that the lack of water affected the marijuana grow, which thereby required less labor until it was fixed.   Once the water pressure issue was fixed, DEFENDANT PROPERTY 3 again saw increased traffic involving the individuals believed to be tending to the grow.

10

**E. Evidence Gathered From Trash Pulls**

23.     Investigators have periodically gathered trash from 1036 Central St. and

DEFENDANT PROPERTY 1.   From these trash pulls, investigators discovered documents

linking several of the DEFENDANT PROPERTIES and 1036 Central St.   Investigators also

found materials further evidencing a grow operation.

24.     For example, in a trash pull of DEFENDANT PROPERTY 1 conducted on March

20, 2020, investigators discovered an instruction booklet for a "Universal Motor Speed Control."

Based on my training and experience, such an electrical device is often used to regulate the speed

of cooling fans or other electrical components used in indoor marijuana grows.   In addition,

written on the instruction booklet in red ink was "Rainworks Fertilizer Co. Megabud Nutrient

Solution."   I conducted an internet search of these terms and discovered that Rainworks

Fertilizer Company is a Canadian company that produces plant supplements geared towards

marijuana growers, and that Megabud Nutrient Solution is a component in the nutrient cycle

recommended by Rainworks.   Also written on the instruction booklet in red ink was

"Provisiongardensupply.com."   A Google search revealed "provisiongardensupply.ca" an

internet address for Provision Garden Hydroponics and Supplies, a Canadian company that

provides products used for indoor hydroponic cultivation of marijuana plants.   I believe these

are referencing the same site because inputting "www.provisiongardensupply.com" in a Web

browser automatically redirects to "www.provisiongardensupply.ca".

25.     Written on another sheet recovered during this trash pull was "Portacool Cyclone

130".   This is an evaporative cooler that can be used to cool a large area, but is not

recommended for indoor use because use of the cooler also raises humidity, which is not

desirable inside a home or office.   From my training and experience, I have learned that

11

residential marijuana grow-houses are now being constructed in ways to self-contain the grow

inside the residence.   This self-containment of the grow allows grow-rooms to be vented back

inside the house itself, thus reducing outside odors and the appearance of vents or A/C units

visibly attached to the outside of the house.   This type of evaporative cooler does not require

venting outside, and thus, can deliver two desired effects for an indoor marijuana grow operation

without the need to vent to the outside: decreased temperature and increased humidity.

26.     Finally, handwritten in red ink on another piece of paper was "1036 Central St

Palmer MA 01069."

27.     On August 5, 2019, a trash pull from 1036 Central St. contained a Comcast bill

for Palmer Road LLC, 151 Palmer Road, Monson, MA (the address of DEFENDANT

PROPERTY 3, the warehouse); a Home Depot receipt associated with a Visa card ending in

#1699; and handwritten notes in Chinese referencing "dumpsters, or rubbish", "warehouse first

time electric fee", "fans", and "water fee".   The Chinese for "water fee" was written several

times, as if the author was tracking multiple properties.

28.     A history of Home Depot purchases using this Visa card showed that purchases

with that card began in November of 2018, around the same time that DEFENDANT

PROPERTY 3, the warehouse, was purchased.   Numerous purchases were made with that card

totaling several thousands of dollars between November of 2018 and July of 2019.   The

purchases included 200 sheets of drywall, suggesting a large construction project, and, although

the delivery destination is not known, the timing of the delivery is consistent with reports of

construction at DEFENDANT PROPERTY 3; over two hundred extension cords and five power

strips; and various other construction materials, electrical wire, metal conduit, tarps, utility water

pumps, PVC pipe fittings, oil heaters, room-darkening blinds, and dehumidifiers.   This

equipment is consistent with equipment needed to construct and maintain a large-scale marijuana operation.   An on-line Home Depot order receipt from May 29, 2019 shows the purchase of six "Cyclone 130 Evaporative Coolers", using the same Visa card.   As noted above, such coolers are not recommended for indoor use because use of the cooler also raises humidity, which would not be desirable inside a home or office.   In addition, a Home Depot receipt shows that "Xing Wang" of "1036 Central Street, Palmer, MA" used this credit card to order several new appliances, totaling $2,150.00, in March 2019 that were delivered to 1036 Central St.

## F. Electrical Use at the DEFENDANT PROPERTIES

29.     Based on my training and experience, I know that large amounts of electrical power are needed in support of indoor marijuana cultivation because of the use of artificial lighting in place of the sun when growing indoors.   These lights are referred to as "grow lights" and are often 400 watt to 1000 watt metal halide or high pressure sodium bulbs.   In addition, I know that indoor marijuana growing operations require extremely large amounts of electricity to power the hardware needed to grow the plants.   I know that indoor cultivators of marijuana utilize large quantities of electricity to operate pumps, fan blowers, humidifiers, air conditioners, carbon dioxide generators, ballasts, and high intensity lights.

30.     In June 2020, I reviewed records obtained from National Grid, the electricity utility for this area, for several of the DEFENDANT PROPERTIES and other, similar nearby residences (not Defendant Properties).   A comparison of these records, as set forth in the below tables, demonstrates that the DEFENDANT PROPERTIES use electricity at an abnormally high rate and in a manner that is consistent with the high power consumption needed to operate an indoor marijuana grow.   Although I reviewed the electrical usage of DEFENDANT PROPERTY 3, the warehouse, I was unable to identify any nearby comparable properties.

13

*Electrical Usage at DEFENDANT PROPERTY 1 and DEFENDANT PROPERTY 2*

31.    The following table provides a kilowatt-hour monthly usage comparison between the DEFENDANT PROPERTY 1 and DEFENDANT PROPERTY 2 and similar-sized houses nearby for the three month period of March through May 2020:

| | ELECTRICAL USAGE AT DEFENDANT PROPERTY 1 AND DEFENDANT PROPERTY 2 | | | |
| --- | --- | --- | --- | --- |
| | DEFENDANT PROPERTY 1 3,398 Sq. Ft. 4 bed, 2 bath | DEFENDANT PROPERTY 2 2,934 Sq. Ft. 6 bed, 3 bath | 30 Main St. 1,836 Sq. Ft. 4 bed, 1.5 bath | 42 Main St. 3,476 Sq. Ft. 8 bed, 4 bath |
| Month / Year | Kilowatt Hours | | | |
| May 2020 | 5,613 | 13,834 | 487 | 674 |
| Apr 2020 | 5,890 | 15,720 | 580 | 670 |
| Mar 2020 | 7,450 | 15,606 | 496 | 836 |

32.    Based on kilowatt per square foot, between March and May 2020, DEFENDANT PROPERTY 1 used between 1.65 kw/sq.ft. and 2.19 kw/sq.ft. each month, and DEFENDANT PROPERTY 2 used between 4.71 kw/sq.ft. and 5.36 kw/sq.ft. each month.   In contrast, during that time period, 30 Main St. used between .26 kw/sq.ft. and .32 kw/sq.ft., and 42 Main St. used between .19 kw/sq.ft. and .24 kw/sq.ft.

33.    The difference in electrical usage between DEFENDANT PROPERTY 1 and DEFENDANT PROPERTY 2 and their neighbors strongly suggests that there is a significant indoor marijuana growing operation at both DEFENDANT PROPERTY 1 and DEFENDANT PROPERTY 2.   Each of these DEFENDANT PROPERTIES' electrical usage is nearly ten times or more the usage of its neighbors for the months analyzed.

*Electrical Usage at DEFENDANT PROPERTY 4*

34.     The following table provides a kilowatt-hour monthly usage comparison between DEFENDANT PROPERTY 4 and other houses nearby for the three month period of March through May 2020:

| | ELECTRICAL USAGE AT DEFENDANT PROPERTY 4 | | |
| --- | --- | --- | --- |
| | **DEFENDANT PROPERTY 4** 2,622 Sq. Ft. 4 bed, 1.5 bath | **4041 Pleasant St.** 1,134 Sq. Ft. 3 bed, 1 bath | **4046 Pleasant St.** 1,396 Sq. Ft. 3 bed, 1.5 bath |
| **Month / Year** | **Kilowatt Hours** | | |
| May 2020 | 13,622 | 546 | 1,093 |
| Apr 2020 | 16,280 | 664 | 721 |
| Mar 2020 | 13,764 | 565 | 784 |

35.     Based on kilowatt per square foot, between March and May 2020, DEFENDANT PROPERTY 4 used between 5.19 kw/sq.ft. and 6.20 kw/sq.ft. each month.   In contrast, over that same period, 4041 Pleasant St. used between .48 kw/sq.ft. and .59 kw/sq.ft., and 4046 Pleasant St. used between .52 kw/sq.ft. and .78 kw/sq.ft.

36.     Although the houses around DEFENDANT PROPERTY 4 are smaller in size, the magnitude in difference in electrical usage between DEFENDANT PROPERTY 4 and other houses in the area, in excess of ten times or more, does not appear to be attributable to a difference in square footage, but rather indicates the presence of an indoor marijuana grow.

*Electrical Usage at DEFENDANT PROPERTY 5*

37.     The following table provides a kilowatt-hour monthly usage comparison between DEFENDANT PROPERTY 5 and other houses nearby for the three month period of March through May 2020:

| | ELECTRICAL USAGE AT DEFENDANT PROPERTY 5 | | |
|---|---|---|---|
| | **DEFENDANT PROPERTY 5** 4,112 Sq. Ft. 5 bed, 4 bath | **2033 High St.** 2,408 Sq. Ft. 5 bed, 1.5 bath | **2057-2061 High St.** 3,112 Sq. Ft. 5 bed, 3 bath |
| Month / Year | Kilowatt Hours | | |
| May 2020 | 2,535 | 1,496 | 1,039 |
| Apr 2020 | 0 | 1,692 | 1,525 |
| Mar 2020 | 0 | 1,604 | 2,153 |

38.     With DEFENDANT PROPERTY 5, there is only a slight increase in electrical usage in comparison to the surrounding properties; the kilowatt per square foot usage is roughly the same as 2033 High Street, but approximately double that of 2057-2061 High Street. DEFENDANT PROPERTY 5 was purchased on February 24, 2020, and based on surveillance done since that date, I believe that the property is in the process of being converted into a full-scale indoor marijuana grow.   The installation of high-powered lights, electrical lines, air conditioners and water pumps takes a period of time after the purchase of the location, and would only be used in rooms that have been renovated.

## CONCLUSION

39.     Based on the facts as set forth in this affidavit, I have probable cause to believe

that the DEFENDANT PROPERTIES are subject to forfeiture to the United States pursuant to 21

U.S.C. § 881(a)(7) because the DEFENDANT PROPERTIES are being used, or intended to be

used, to facilitate the growing marijuana for distribution, in violation of federal law.

Sworn to under the pains and penalties of perjury,

Anthony Fontanella
Special Agent
U.S. Drug Enforcement Administration

Date: July 7, 2020

17